Brenna B. Bell, OSB No. 015199
Oliver J. H. Stiefel, OSB No. 135436
brenna@crag.org │ oliver@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
(503) 233-8044
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **GREATER HELLS CANYON COUNCIL**, an Oregon non-profit corporation; **OREGON WILD**, an Oregon nonprofit corporation; | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | Case No.: 2:26-cv-673 |
| v. | |
| **UNITED STATES FOREST SERVICE**, a federal agency, | (5 U.S.C. § 706(2)) |
| Defendant | (Environmental Matters – National Environmental Policy Act, National Forest Management Act, and Administrative Procedure Act) |

**GLOSSARY OF TERMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| CEQ | Council on Environmental Quality |
| Decision or Ellis Project | Ellis Integrated Vegetation Project |
| Defendant, Forest Service, or Agency | United States Forest Service |
| EIS | Environmental Impact Statement |
| Forest Plan | Land and Resource Management Plan |
| GHCC | Greater Hells Canyon Council |
| HEI | Habitat Effectiveness Index |
| mi/mi$^2$ | Miles per square mile, a measure of road density |
| MIS | Management Indicator Species |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| Plaintiffs | Greater Hells Canyon Council and Oregon Wild |
| ROD | Record of Decision |
| USDA | United States Department of Agriculture |

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## INTRODUCTION

1. Plaintiffs Greater Hells Canyon Council and Oregon Wild (collectively, "Plaintiffs") bring this challenge to the final agency action by the United States Forest Service ("Defendant," "Forest Service," or "agency") to approve the Ellis Integrated Vegetation Project on the Umatilla National Forest in eastern Oregon ("Ellis Project" or "Decision").

2. The Umatilla National Forest encompasses 1.4 million acres of the Blue Mountains in northeast Oregon and southeast Washington and is home to a large herd of Rocky Mountain elk (*Cervus elaphus)*, as well as the only herd of moose in Oregon and many other fish and wildlife species. The 110,000-acre Ellis Project area includes regions with the highest density of Rocky Mountain elk in the state.

3. Elk behavior is highly impacted by road use because they avoid both foraging or using cover in land adjacent to open roads. Without enough secure habitat, determined mainly by the density of open roads, elk leave the National Forest for adjacent private lands where they cause significant damage to crops, fences, and livestock pastures. This problem was recently detailed in the New York Times article, "In a Wild Corner of the West, Elk are Everywhere and Causing Conflict". Across a broad landscape like the Ellis Project, the desired minimum amount of secure elk habitat is 30%. Currently, elk security in the project area is only 11%.

4. Retaining elk on public land is a key priority of community stakeholders. To that end, wildlife managers from the Confederated Tribes of the Umatilla Indian Reservation, Oregon Department of Fish and Wildlife, Washington Department of Fish and Wildlife, Rocky Mountain Elk Foundation, Bureau of Land Management, and the Forest Service spent several years working together to plan the Ellis Project. Stakeholders broadly agree that decreasing the density

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—2

of open roads, while also improving forage and habitat by thinning and burning, is the best way to improve elk security and keep the herd on the National Forest.

5.     Because the Ellis Project is a major federal action that will significantly impact the environment, the Forest Service analyzed project impacts in an Environmental Impact Statement ("EIS") as required by the National Environmental Policy Act ("NEPA"). 42 U.S.C. §§ 4321–4370h.

6.     In the both the draft and final EIS, the Forest Service analyzed several action alternatives in detail, in addition to a "no action" alternative. All of the action alternatives included significant amounts of both road closures and vegetation management. Alternative 2, the "preferred alternative" proposed over 130 miles of road closures and decommissioning.

7.     In contrast, and without any prior notice to stakeholders, when the Forest Service later released its draft Record of Decision ("ROD") for the Ellis Project, it modified the proposed action to remove the travel management components. In other words, all of the logging, hauling, road building and prescribed fire included in the action would be implemented without *any* of the planned road closures and decommissioning.

8.     Plaintiffs, several hunting organizations, the Oregon Department of Fish & Wildlife, and the Confederated Tribes of the Umatilla Indian Reservation objected to the draft ROD and requested that the Forest Service reconsider its choice to remove the road closures and decommissioning from the Ellis Project.

9.     On January 23, 2026, the Forest Service issued its final ROD for the Ellis Project which stated that the Forest Service "[n]eeded to balance current national direction and concerns identified throughout the project process" and reinserted seasonal use restrictions on 14.4 miles

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—3

of roads. It did not include any of the year-round road closures or road decommissioning initially analyzed as a part of Alternative 2.

10.    Plaintiffs bring claims under the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1614, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and NEPA. This action is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.

11.     Plaintiffs seek an order holding unlawful and setting aside the Ellis Project Record of Decision and final EIS because: (1) Defendant violated NFMA, its implementing regulations, and the APA by failing to comply with Umatilla Forest Plan standards for Big Game Management; (2) Defendant violated the APA by failing to provide a satisfactory explanation for its change in position; and (3) Defendant violated NEPA, its implementing regulations, and the APA by (a) failing to take a "hard look" at the impacts of selecting an action whose impacts significantly depart from the anticipated impacts of all the alternatives analyzed, and (b) failing to prepare a supplemental EIS to evaluate those impacts.

12.    Plaintiffs seek vacatur of the Record of Decision and final EIS and an injunction prohibiting Defendants from implementing the Ellis Project until a supplemental EIS is prepared in conformity with NEPA and the APA and the Forest Service complies with NFMA's substantive requirements.

13.    Should Plaintiffs prevail at any stage in this litigation, Plaintiffs will seek an award of costs and attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

///

///

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—4

**JURISDICTION**

14.    Jurisdiction over this action is conferred by 28 U.S.C. § 1331 as it presents a federal question because it arises under the laws of the United States, including the APA, NEPA, and NFMA. There is a present, actual, and justiciable controversy between the parties. The requested relief is proper under 28 U.S.C. § 2201 (declaratory relief) and § 2202 (injunctive relief), and 5 U.S.C. §§ 705 & 706.

15.    Plaintiffs have exhausted their administrative remedies because they submitted comments on the Ellis Project EIS and filed pre-decisional objections to the agency's decision. The challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.

**VENUE**

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Ellis Project area is entirely located within this judicial district. Defendants maintain an office in this judicial district. Plaintiffs Greater Hells Canyon Council and Oregon Wild maintain offices in this judicial district.

17.    **Intradistrict Assignment**. This case is properly filed in the Pendleton Division pursuant to Local Rule 3-2 because the Project is located on the Umatilla National Forest in Umatilla, Morrow, and Grant Counties. A substantial part of the events or omissions giving rise to this claim occurred, and the property that is subject to this action is situated in, the Pendleton Division.

**PARTIES**

18.    Plaintiff GREATER HELLS CANYON COUNCIL (formerly known as Hells Canyon Preservation Council) is a regional nonprofit organization based in northeast Oregon with approximately 2,000 members and supporters. For over 50 years, GHCC's mission has been to

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—5

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

connect, protect, and restore the wild lands, waters, native species and habitats of the greater Hells Canyon region, ensuring a legacy of healthy ecosystems for future generations. GHCC has been actively involved in commenting on, objecting to, and in some instances, litigating Forest Service projects in the region.

19.    Plaintiff OREGON WILD is a non-profit organization with approximately 20,000 members and supporters throughout the State of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon and maintains field offices in Enterprise, Bend, and Eugene. Oregon Wild's mission is to protect and restore Oregon's wildlands, wildlife, and waters as an enduring legacy. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds programs protect pristine drinking water, unparalleled recreation opportunities, and fish and wildlife habitat across Oregon.

20.    Plaintiffs' members, supporters, and staff regularly visit and enjoy the Umatilla National Forest where the Forest Service plans to implement the Ellis Project and intend to do so again in the near future. The members, supporters, and staff appreciate the wildlife in this area, and engage in recreational, scientific, and spiritual activities, such as hunting, hiking, camping, fishing, photography, watershed research, and observing wildlife.

21.    Plaintiffs have organizational interests in the proper and lawful management of the Umatilla National Forest. Plaintiffs, and their members, supporters, and staff have participated extensively in relevant administrative actions regarding projects on this Forest and have actively participated in the Ellis Project's public comment and administrative process.

22.    Plaintiffs, and their members, supporters, and staff would sustain injury to their aesthetic, educational, recreational, spiritual, and scientific interests if the Ellis Project is implemented as authorized. Plaintiffs, and their members, supporters, and staff have concrete

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—6

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

plans to return to the areas where the Forest Service intends to implement the Ellis Project. Unless this Court grants the requested relief, Plaintiffs, and their members, supporters, and staff would be adversely harmed by the Ellis Project, as modified by the final decision.

23.     Defendant UNITED STATES FOREST SERVICE is an agency within the United States Department of Agriculture entrusted with the management of our national forests. The Forest Service is headquartered in Washington, D.C., and it has administrative regions across the country. The national forests of Oregon are in Region 6. All of the actions and omissions alleged in this Complaint occurred in Region 6.

## LEGAL BACKGROUND

**The National Forest Management Act (NFMA)**

24.     In 1976, Congress enacted NFMA, which governs the Forest Service's management of the National Forests. NFMA requires each National Forest to develop a Land and Resource Management Plan ("Forest Plan") to guide natural resource management activities forest-wide. 16 U.S.C. 1604(a).

25.     Pursuant to NFMA and its implementing regulations, each Forest Plan must satisfy multiple use mandates by setting standards, management goals and objectives, and monitoring and evaluation requirements for outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness objectives. 16 U.S.C. §§ 1604(e), (f), (g); 36 C.F.R. Part 219 (1982). Among other requirements, each Forest Plan must manage fish and wildlife habitat to "maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19.

26.     Each site-specific project on a National Forest must be consistent with the governing forest plan. 16 U.S.C. § 1604(i).

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—7

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

27.     The Umatilla National Forest Land and Resource Management Plan ("Umatilla Forest Plan") was adopted in 1990, pursuant to the 1982 version of the NFMA implementing regulations.

**The National Environmental Policy Act (NEPA)**

28.     Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the nation." 42 U.S.C. § 4321.

29.     Congress declared it to be the "continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." *Id.* § 4331(a).

30.     To effectuate its policy goals, NEPA requires all agencies of the federal government to prepare a "detailed statement" for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Known as the Environmental Impact Statement or EIS, the detailed statement must describe the reasonably foreseeable environmental impacts of the proposed agency action; any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; reasonable alternatives to the proposed agency action, including an analysis of not implementing the proposed agency action;

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—8

the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented. *Id.* § 4332(2)(C)(i)–(v); *id.* § 4336(b).

31.    An EIS must set forth a statement that "briefly summarizes the underlying purpose and need for the proposed agency action." *Id.* § 4336(d).

32.    In carrying out their NEPA obligations, federal agencies must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an [EIS]." *Id.* § 4332(2)(D).

33.    NEPA's action-forcing procedures require agencies to take a "hard look" at the environmental consequences of government actions.

34.    For decades, federal agencies were guided in their NEPA analysis by regulations promulgated by the Council on Environmental Quality ("CEQ"). On January 20, 2025, President Trump issued an executive order, E.O. 14,154, 90 Fed. Reg. 83,553 (Mar. 17, 2025), rescinding President Carter's 1977 executive order that had directed CEQ to promulgate regulations implementing NEPA. *See* E.O. 11,991, 42 Fed. Reg. 26,967 (May 24, 1977). CEQ then issued an interim final rule rescinding all NEPA regulations. 90 Fed. Reg. 10,610 (Feb. 25, 2025).

35.    While revisions to NEPA regulations are ongoing, CEQ advised that agencies should continue to follow their existing practices and procedures for implementing NEPA, consistent with the text of the statute, EO 14154, and the new CEQ guidance.

36.    On July 3, 2025, the U.S. Department of Agriculture ("USDA") issued an Interim Final Rule modifying USDA NEPA implementing regulations and removing various USDA NEPA

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

implementing regulations. 90 Fed. Reg. 29,646 (July 3, 2025). Those regulations are codified at 7 C.F.R. Part 1(b).

37.     The Ellis Project Final EIS was issued in May of 2025, prior to the Interim Final Rule. The Forest Service did not specify which NEPA regulations it relied on in assessing the Ellis Project's compliance with NEPA.

38.     Regardless of which set of regulations apply, a federal agency has a continuing duty to be alert to new information or changed circumstances that may alter the results of its original environmental analysis. If the agency changes a project after the EIS is complete, or new information arises that impacts the project's outcomes, NEPA requires that the agency update its analysis to reflect those changes.

39.     According to the former CEQ regulations in place when the Forest Service originally proposed the Ellis Project, agencies shall prepare supplements to either draft or final EISs if "(i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "(ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1) (2019).

40.     According to the former CEQ regulations in place from 2020–2024, agencies shall prepare supplements to either draft or final EISs if major Federal action remains to occur and "(i) the agency makes substantial changes to the proposed action that are relevant to environmental concerns" or "(ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1) (2024).

COMPLAINT FOR DECLARATORY &
INJUNCLINT RELIEF—10

41.     Similarly, the Interim Final Rule states that the agency "shall reevaluate, and if necessary, correct, revise, or supplement (hereinafter update) environmental documents, if a major Federal action or portion thereof remains to occur, and the subcomponent makes changes to the proposed action, or selected alternative, that have the potential to change the anticipated degree of effect." 7 CFR § 1b.7(r)(1).

**The Administrative Procedure Act (APA)**

42.     The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. *Id.* § 704.

43.     Upon review under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. *Id.* § 706(2)(A), (C), (D).

## FACTS

**Elk on the Umatilla National Forest**

44.     Rocky Mountain elk roam widely through the Ellis Project area with their location changing throughout the year based on the season and access to forage, cover, and water. Grasses constitute most of an elk's diet; however, elk will also eat forbs, shrubs, lichens, and other vegetation, depending on the forage availability. Ample winter range habitat, which consists of open grass and shrub lands at low and mid elevations, is required to carry elk through the critical winter period.

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—11

45.    Elk also require dense forested stands for hiding cover. These stands are used for escaping predators and during periods of high disturbance such as hunting seasons.

46.    The Umatilla Forest Plan designates Rocky Mountain elk as a Management Indicator Species ("MIS"). Pursuant to the 1982 Rule implementing NFMA, MIS are selected because their response to management actions can be used as an indicator of other species dependent upon similar habitat conditions.

47.    More specifically, MIS are selected to provide for the habitat needs of vertebrate species with similar habitat groupings, to monitor selected habitats that could be impacted through forest management activities, and to provide sufficient populations of selected species to meet the demands of wildlife-related recreation.

48.    The Umatilla National Forest selected elk as an MIS to indicate the health of general forest habitat and winter ranges. The Forest Service assumes that if good habitat is provided for elk and their population is maintained at the desired level, then good habitat is also being provided for other species with similar needs.

49.    Historically, elk used Umatilla National Forest lands in spring, summer, and fall and mostly wintered at lower elevations which are now largely privately owned lands that have been converted to agriculture.

50.    When the Forest Service adopted the Umatilla Forest Plan in 1995, it highlighted the maintenance of elk populations as a key desired future condition of the Umatilla National Forest. In particular, the Forest Service stipulated that big game winter range habitat condition will be excellent, through management of timber (cover), forage, and roads. The Plan intended that increasing forage and habitat security on the Forest would result in declining impacts to private lands.

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—12

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

51.    However, over the past several decades, elk have been using private lands north of the Ellis Project area earlier in the fall and staying longer in the spring. Some elk have become residents on private lands and no longer use traditional seasonal ranges. This shift in the use of private lands often starts during hunting seasons because of disturbance to elk from increased use of motorized vehicles and hunting pressure.

52.    When elk leave the National Forest for adjacent private lands, they cause significant damage to crops, fences, and pastures managed for livestock. Elk population distribution is a major issue in this area, both due to continued degradation of elk habitat on public land and the corresponding increases in elk impact on adjacent private land.

53.    Maintaining access to elk on public lands is also important for the recreational users of Umatilla National Forest, including hunters, hikers, and photographers. Expenditures by these recreationists provide communities surrounding the Forest with a significant increase in business activity.

54.    The Starkey Experimental Forest and Range in northeast Oregon is managed by the Forest Service and conducts research focused on ecology and management of elk, mule deer, cattle, and associated human activities, land uses, and disturbance regimes common to public and private lands. Researchers at Starkey have produced several important studies about the interaction of elk and roads, which the Forest Service used as the basis for planning the Ellis Project.

55.    This body of research found that the most effective way to increase elk security and distribution, and encourage the herd to stay on the National Forest, is to improve forage conditions though implementing vegetation management, such as thinning and prescribed fire, coupled with strategic road closures throughout the security area.

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—13

56.    Though topography and cover also influence how elk use the landscape, roads open to motorized use are one of the most consistent and strongest variables that predict elk distribution and use of public lands. Elk behavior is highly impacted by road use and they avoid land adjacent to roads open to motorized vehicles. Research from Montana found that areas more than 0.5 miles from open roads and 250 acres or greater in size are considered "elk security" or refuges where elk are less likely to be impacted by vehicle use and more likely to escape harvest during a hunting season. This model for determining elk security is called the "Hillis paradigm," after the lead author of the paper that introduced the model. According to the Hillis paradigm, 30% of the land across a broad landscape like the Ellis Project area should be able to provide secure habitat.

57.    A reduction in open road density in strategic areas also may decrease daily movements of elk in their respective home ranges which can lead to energetic benefits resulting in increased fat reserves and thus, greater survivorship and productivity.

58.    There are approximately 340 miles of roads open to motorized use in the Ellis Project area and road densities within the Project area are generally higher than the Umatilla Forest averages (the Forest Plan has an open road density goal of 2.0 miles/sq. mile). There are at least 2.8 $mi/mi^2$ of open road in the Heppner Ranger District and 4.1 $mi/mi^2$ in the John Day Ranger District. The actual road density on the ground may be even higher, as the Forest Service's road density analysis does not include user-created roads, private or county roads, or Level 1 "stored" roads, even though those roads are often not gated, and thus still used. Roads considered "open" to vehicular access are those that receive, on average, more than four trips per month.

///

///

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**Umatilla Forest Plan Standards & Guidelines**

59.    The Umatilla Forest Plan allocated the Forest into many different categories, each with its own management priorities and standards and guidelines. Of particular relevance to the current issue are the land allocations that prioritize the maintenance and distribution of habitat for wildlife species.

60.    On the Big Game Winter Range land allocation ("C3"), the Forest Plan's goal is to "[m]anage big game winter range to provide high levels of potential habitat effectiveness and high-quality forage for big game species." On Wildlife Habitat ("C4"), the goal is to "[m]anage forest lands to provide high levels of potential habitat effectiveness for big game and other wildlife species with emphasis on size and distribution of habitat components." Finally, on Timber & Big Game ("E2"), the goal is to manage forest lands "to emphasize production of wood fiber (timber), encourage forage production, and maintain a moderate level of big game and other wildlife habitat."

61.    On these wildlife-focused land allocations, the Umatilla Forest Plan sets minimum standards for the elk Habitat Effectiveness Index ("HEI"). The HEI model was developed in the Blue Mountains to predict the influence of forest management and recreational use on elk in winter range. The model uses the distribution of cover and forage areas, cover quality, and density of roads open to motorized use to indicate how effective an area will be in supporting big game.

62.    The Forest Plan established the highest HEI standard for C3 Big Game Winter Range, which has a minimum HEI of 70. Compliance is measured on each individual winter range.

63.    Land designated as C4 Wildlife Habitat has a minimum HEI of 60, while the minimum HEI for E2 Timber & Big Game is 45.

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—15

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

64.    In the Ellis Project area, 12,198 acres of land are designated as C3 Big Game Winter Range, 31,957 acres are C4 Wildlife Habitat and 36,723 acres are E2 Timber & Big Game.

65.    The Umatilla Forest Plan allows for limited exceptions to meeting the HEI standard in C4 and E2 allocations, when: 1) on the ground conditions make compliance impossible, 2) the project is consistent with the overall goals of the land designation, and 3) the exceptions are documented in a project's NEPA analysis. The Forest Plan does not include any exceptions for meeting the HEI standard in C3 areas.

66.    Meeting the minimum HEI in each land designation supports other Forest Plan goals for wildlife. The Plan states that "proper implementation of all area direction and standards and guidelines is an important aspect to providing for the needs of wildlife," and that "achieving big game habitat objectives will require meeting HEI and cover standards for management areas A10, C4, C5, C7, E1, E2 & F4."

67.    The Umatilla Forest Plan instructs big game management on federal land to support the work of other wildlife managers. A goal of the Forest Plan is to "provide and manage big game (elk and deer) habitat and its components (cover, forage, and roads) to assist in meeting state wildlife agency population management objectives." This is repeated: "Emphasize partnerships in managing and enhancing the Forest wildlife resources. Utilize all types of available opportunities and methods in strengthening existing and developing new partnerships to attract funding and support for wildlife programs and resources."

**Ellis Integrated Vegetation Project**

68.    The Ellis Project area covers approximately 110,000 acres on both private and National Forest System lands in the Heppner & North Fork John Day Ranger Districts of the Umatilla

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—16

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

National Forest. There are no treatments proposed for private lands, which overlap about 4,626 acres within the project boundary.

69.     The Umatilla National Forest includes ceded lands and/or usual and accustomed lands for the Confederated Tribes of Warm Springs Reservation of Oregon (Wasco, Warm Springs, Paiute Tribes) and the Confederated Tribes of the Umatilla Indian Reservation (Walla Walla, Cayuse, Umatilla Tribes).

70.     Beginning in March 2018, the Forest Service discussed the Ellis Project in government-to-government meetings with the Confederated Tribes. During and after meetings, tribal representatives engaged in project planning, in large part because of their desire to keep the elk herd on publicly managed land.

71.     In addition to the tribal government consultation, the Forest Service received input about the Ellis Project from state wildlife managers and members of the public through several open houses, field visits and public meetings, an interactive map, and hundreds of public comments.

72.     A key interest for tribal governments and community stakeholders was ensuring that the project would increase security for the elk herd on the National Forest. The Ellis Project area is currently at 11% security, far below the 30% secure habitat shown to help improve elk distribution across the greater landscape.

73.     In October, 2018, the Forest Service released a "Project Proposal" for the Ellis Project, generally describing the need for the project and the range of planned actions.  As regards improving wildlife habitat through road decommissioning, the Proposal stated, "[e]lk security will be improved by closing or seasonally closing 30 to 100 miles of open motorized roads. Elk select for areas with increasing distance from open motorized routes, with an average minimum distance of ½ mile (Ager et al. 2003, Hillis et al. 1991, Johnson et al. 2005a, Rowland et al.

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—17

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

2000). Decreasing disturbance from motorized vehicles will allow elk to utilize available forage and cover during calving and winter seasons, improve distribution across all seasonal ranges and encourage elk to remain on public lands."

74.    In February 2022, the Forest Service issued a draft EIS that described the Purpose & Need for the Project as "increasing forest health and vigor; enhancing unique plant communities; *improving wildlife habitat;* maintaining and continuing public and traditional land uses; and protecting values at risk and increasing public and firefighter safety in the event of a wildfire" (emphasis added).

75.    The "Desired Outcomes" of the project include the "need to improve terrestrial wildlife habitat," with one strategy being "[i]mprove distribution of elk by: improving security, increasing quality and quantity of forage."

76.    The Forest Service collaborated with the Confederated Tribes, state biologists and hunting/conservation organizations to identify areas and actions to help improve elk distribution during alternative development. Each action alternative included differing amounts of both vegetation management and travel management, including commercial thinning; small diameter thinning; tree planting; mechanical fuels treatments and biomass utilization; pile, jackpot, and landscape burning; pruning; planting of native vegetation; road closures and road decommissioning.

77.    In the draft EIS, the Forest Service analyzed in detail four action alternatives (in addition to a "no action" alternative), all of which included both road closures and vegetation management. Based on information from stakeholders and wildlife managers, the Forest Service developed Alternative 5, which included the greatest amount of seasonal road closures to meet the goal of providing 30% or more secure areas for elk within the analysis area.

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—18

78.     Despite this extensive collaboration, the Forest Service removed Alternative 5 from detailed analysis in the final EIS, relying on a short statement that the Umatilla National Forest is consistent with Forest Plan desired conditions for road density, and that the agency misapplied the Hillis study was to the Ellis project.

79.     The final EIS identified Alternative 2 as the preferred alternative. Of the three action alternatives analyzed in the final EIS, Alternative 2 included the most vegetation management and also the most road closures. As described in the final EIS, Alternative 2 would thin 25,207 acres of large-diameter and 53,872 acres of small-diameter conifers, build 17 miles of new temporary roads, log up to 273 miles of 500-foot fuel breaks along existing open roads, and use prescribed fire on almost 88,000 acres. Alternative 2 also included reclassifying 19.6 miles of year-round open road as only "seasonally open", closing 95.3 miles to motorized use year-round, and entirely decommissioning 13.6 miles of roads.

80.     The Forest Service laid out its decision-making framework in the final EIS, stating that its decision will be based on: 1) how well the selected alternative achieves the project's purpose and need; and 2) how well the selected alternative responds to relevant issues.

81.     The Forest Service explained that "Alternative 2 was developed to meet the purpose and need of the project and modified to refine acres proposed for treatment and the description of activities. It addresses input and concerns from our partners and the public that were received during the scoping comment period. This alternative responds to all Relevant Issues to some degree."

82.     To analyze the impacts to wildlife and compliance with the Forest Plan's elk HEI standards, the final EIS broke the Ellis project area into seven sections. For each section, the

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—19

Forest Service determined both the baseline HEI and how the various alternatives would impact future HEI.

83.    This analysis showed that several sections currently do not meet the Umatilla Forest Plan HEI standards. This is mostly due to current road densities, not the amount or quality of cover available.

84.    Each of the proposed action alternatives would benefit elk security, road density, HEI, and forage to varying degrees. They would also all reduce the amount of satisfactory cover. Of the action alternatives analyzed in the final EIS, Alternative 2 would provide the greatest beneficial impacts by increasing elk security to 27% (a 16% increase), decreasing road density to 1.4 mi/mi$^2$, and increasing HEI in all areas except Area 1.

85.    After the publication of the final EIS, and with no notice to stakeholders, in its draft Record of Decision the Forest Service created a new action alternative by combining Alternative 2 with the "No Action" alternative for travel management, so that all of the logging, hauling, road building and prescribed fire included in Alternative 2 would be implemented without *any* of the planned road closures and decommissioning.

86.    The reason given for this change was similar to the reason the Forest Service used for removing Alternative 5 from further assessment in the final EIS: "Road closures were removed from this decision because the science used to develop roads management for the action alternatives was misapplied to the Ellis project (Hillis et al 1991)."

87.    This reason does not acknowledge the extensive body of research from the nearby Starkey Experimental Forest & Range that the Forest Service relied on in planning, which unequivocally shows that road closures are necessary for the Ellis Project to meet its purpose and need. Nor does this explanation align with earlier Forest Service statements about the Hillis

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—20

guidelines for elk security: "Hillis proposed this framework to be a *starting point*, and the minimum guidelines, to begin thinking about creating elk security when planning for timber projects on public lands" (emphasis added).

88.    Shortly after the draft ROD was released, the Regional Forester from Forest Service Region Six issued a memo instructing decision makers to temporarily suspend including road closures and decommissioning into NEPA decisions if they would decrease public access on National Forests.

89.    Plaintiffs, several hunting organizations, the Oregon Department of Fish & Wildlife, and the Confederated Tribes of the Umatilla Indian Reservation all filed timely pre-decisional objections to the draft Record of Decision requesting that the Forest Service reconsider its choice to remove road closures and decommissioning from the Ellis Project, as they are necessary to meet the Project's purpose and need, comply with the Umatilla Forest Plan wildlife standards, and were a key component of the project as analyzed by the EIS. *See generally* 36 C.F.R. Part 218 (regulations governing pre-decisional administrative objection process).

90.    In its response to these objections, the Forest Service agreed that "[t]he draft ROD does not include an explanation of how the research presented by Hillis et al. (1991) was misapplied in developing the road management proposals in Alternative 2 and furthermore doesn't explain the relationship between Forest Plan road density standards and the current need to manage elk distribution through strategically managing motor vehicle access and forage condition."

91.    The Objection Response concluded that this explanation was missing from the draft ROD and directed the Responsible Official to include their rationale for the decision in the final ROD.

92.    On January 23, 2026, the Forest Service issued its final ROD for the Ellis Project. The ROD stated that the Forest Service "[n]eeded to balance current national direction and concerns

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—21

identified throughout the project process" and made slight changes to the Ellis Project to address the objector's concerns. The ROD removed 2,232 acres of large-diameter thinning, and 5,352 acres of small diameter thinning from HEI Area 1, and re-instated 14.4 miles of seasonal road closures, extending the length of the closure to cover the entire hunting season.

93.    The final ROD indicates that the selected action would result in increasing the elk security in the Ellis Area from 11% to 15%, far below the 27% that would have resulted from the road closures initially included in Alternative 2.

94.    The final ROD also includes a "Clarification of Statements Regarding Hillis", which affirms that the minimum desired elk security across a large landscape like the Ellis Project is 30%, that the best available science has found that coupling strategic road closures with road closures improves elk distribution across the landscape, and that the Hillis recommendations provide a starting point and minimum guidelines for land managers planning to increase elk security on public lands.

95.    The clarification also states that the Hillis recommendations should not be directly extrapolated to dry forests like the Ellis project area because, in such forests, elk need *greater* distances from open roads to achieve the same amount of security.

96.    The ROD cited research not included in the final EIS finding that pressure and disturbance from hunting has a strong influence on elk habitat use, and that restricting hunting access can alter the elk's distribution across the landscape.

97.    The ROD never reconciles the full body of studies and research cited in the final EIS that demonstrate the importance of road closures to promote elk security with the Forest Service's decision to remove over 90 miles of road closures from the selected alternative, or explains how this decision will help meet the project's purpose and need.

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—22

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

98.     The final ROD also included a new table to update the HEI analysis. In contrast to the previous HEI tables in the draft and final EIS, this table omitted road density tabulations for the alternatives and the selected action.

## FIRST CLAIM FOR RELIEF
### (Violation of NFMA and 5 U.S.C. § 706(2)(A))

99.     Plaintiffs re-allege and incorporate all preceding paragraphs by reference.

100.     To comply with NFMA and its implementing regulations, the Forest Service must ensure that each site-specific project is consistent with the governing forest plan. 16 U.S.C. § 1604(i).

101.     For the Ellis Project, the Forest Service failed to ensure consistency with Umatilla Forest Plan standards and guidelines for the provision of elk habitat.

102.     For example, on wildlife-focused land allocations including C3, C4, and E2, the Umatilla Forest Plan sets minimum standards for meeting the elk Habitat Effectiveness Index (HEI). The record fails to establish that the Forest Service has met the HEI standards for these land allocations, especially in C3 Winter Range.

103.     Further, a key variable for determining HEI for each land allocation is density of open roads. On most land allocations, the Forest Plan stipulates that roads will be closed in order to meet the HEI standards. The record fails to establish how the Forest Service calculated road density in the Ellis Project area, and whether it included all functionally open roads in its calculation. Nor did the Forest Service explain how the Ellis Project will achieve the HEI standards when, out of the 114.9 miles of permanent and seasonal road closures originally proposed, the final ROD includes only 14.4 miles of *seasonal* closures.

104.     The Forest Service's failure to ensure consistency with the Umatilla Forest Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, 5 U.S.C. § 706(2).

COMPLAINT FOR DECLARATORY &
INJUNCTION RELIEF—23

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**SECOND CLAIM FOR RELIEF**
**(Violation of the Administrative Procedure Act (5 U.S.C. § 706(2))**

105.    Plaintiffs re-allege and incorporate all preceding paragraphs by reference.

106.    A federal agency action is arbitrary and capricious under the APA if the agency offers an explanation to its decision that runs counter to the evidence before the agency. 5 U.S.C. § 706(2), *Advanced Integrative Med. Sci. Inst., PLLC v. United States Drug Enf't Admin.*, 128 F.4th 1133, 1143 (9th Cir. 2025).

107.    An agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). When an agency makes a change in policy or in a planned action, the decision may be arbitrary and capricious if the "agency fails to provide a 'reasoned explanation' for the change." *Mont. Wildlife Fedn v. Haaland*, 127 F.4th 1, 38–39 (9th Cir. 2025). Importantly, the justification offered for a change in policy or agency action cannot be inconsistent with the purpose of the project being implemented.

108.    For the Ellis Project, a key part of the purpose and need is improving terrestrial wildlife habitat, including improving distribution of elk by improving security.

109.    In its NEPA analysis, the Forest Service relied on many studies, and extensive information from tribal and state wildlife biologists and community stakeholders, that all clearly show that reducing the amount of open roads is a necessary component of meeting the Project's purpose to improve elk security in the project area.

110.    With no satisfactory explanation, the Forest Service removed all year-round road closures and all road decommissioning from the final decision.

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—24

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

111.    Because the Forest Service failed to show a rational connection between the facts found and the choice made, and failed to provide a reasoned explanation for a change that renders the final action inconsistent with the stated purpose and need, the Ellis Project violates the APA.

**THIRD CLAIM FOR RELIEF**
**(Violation of NEPA and 5 U.S.C. §§ 706(1) & 706(2)(A))**

**Count 1**

112.    Plaintiffs re-allege and incorporate all preceding paragraphs by reference.

113.    NEPA requires that federal agencies prepare an EIS when a major federal action is proposed that may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). In an EIS, the agency must disclose and consider a proposed action's reasonably foreseeable environmental effects, any reasonably foreseeable adverse environmental effects which cannot be avoided, a reasonable range of alternatives, the relationship between local short-term uses of man's environmental and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitments of Federal resources. *Id.* § 4332(2)(C)(i)–(v). The agency must ensure the professional integrity, including scientific integrity, of the discussion and analysis in the EIS. *Id.* § 4332(2)(D).

114.    The Ellis Project final EIS does not disclose or consider the foreseeable environmental effects of the selected alternative because the final ROD combines parts of multiple different alternatives in a combination that was not anticipated or analyzed in the draft or final EIS.

115.    At no place does the final EIS discuss the impacts to elk population or behavior, the impacts to adjacent private land, compliance with the Forest Plan, or the adverse socioeconomic impacts from moving forward with all the vegetation management included in Alternative 2, including associated road building, *without* any of the habitat security benefits derived from road closures and decommissioning.

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—25

116.    The Forest Service's failure to take the required "hard look" at the selected action's direct, indirect, and cumulative impacts on elk is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 2**

117.    Plaintiffs re-allege and incorporate all preceding paragraphs by reference.

118.    An agency that has prepared an EIS cannot simply rest on the original document. The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a "hard look" at the environmental effects of its planned action.

119.    The Forest Service has an obligation to supplement its final EIS based on substantial changes and/or changed circumstances regardless of which version of the NEPA implementing regulations applied to the Ellis Project.

120.    Under 40 C.F.R. § 1502.9(c)(1) (2019), agencies shall prepare supplements to either draft or final EISs if "(i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "(ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

121.    Under 40 C.F.R. § 1502.9(d)(1) (2024), agencies shall prepare supplements to either draft or final EISs if major Federal action remains to occur and "(i) the agency makes substantial changes to the proposed action that are relevant to environmental concerns" or "(ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

122.    Under 7 CFR §1b.7(r)(1), when the action agency changes the proposed action after the EIS is complete, or new information arises that has the potential to change the anticipated degree

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—26

of effect, the Forest Service "shall reevaluate, and if necessary, correct, revise, or supplement (hereinafter update) environmental documents."

123.    In the Ellis Project final EIS, every action alternative included road management, including seasonal road closures, year-round road closures, and road decommissioning. As a result of these road management actions, every action alternative would have improved both elk security and the HEI in the project area as compared to existing conditions.

124.    The final EIS did not include substantive information or analysis about the impacts of **not** decreasing road use and density, aside from acknowledging that if the Ellis Project does not occur, "during hunting seasons, elk may continue to leave National Forest lands to nearby private property and may continue to cause damage to agricultural lands."

125.    By selecting a hybrid action that includes 96,127 acres of vegetation management, 17 miles of temporary road construction, and 588 road miles used for log hauling, with only 14.4 miles of seasonal road closures and *no* year-round closures or road decommissioning, the Forest Service chose a final action that significantly departed from the anticipated degree of effect of the action alternatives analyzed in the final EIS.

126.    The Forest Service's failure to prepare a supplemental EIS to analyze the impacts of the selected action violates NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

127.    In the alternative, the Forest Service's failure to prepare a supplemental EIS constitutes agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief from this Court:

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—27

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

124.    Declare the Forest Service violated the National Forest Management Act, its implementing regulations, and the APA by failing to ensure consistency with the Umatilla Forest Plan;

122.    Declare that the Forest Service violated the APA by failing to articulate a satisfactory explanation, including a rational connection between the facts found and the choice made, for its change in position and decision to substantially reduce the amount of road closed by the Ellis Project;

123.    Declare the Forest Service violated the National Environmental Policy Act, its implementing regulations, and the APA by failing to take a hard look at the impacts of the Ellis Project and failing to prepare a supplemental EIS;

124.    Vacate the Record of Decision and Environmental Impact Statement and remand to the Forest Service for additional consideration;

125.    Issue preliminary and permanent injunctive relief prohibiting the Forest Service from implementing the Ellis Project until such time as the Forest Service can demonstrate compliance with the requirements of the National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act;

126.    Award to Plaintiffs costs, including expenses, expert witness fees, and reasonable attorney fees under applicable law; and

127.    Grant Plaintiffs such further relief as may seem to this Court to be just, proper, and equitable.

DATED this 6th day of April 2026.


/s/Brenna Bell

Brenna B. Bell, OSB No. 015199,

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—28

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

(503) 233-8044  brenna@crag.org
Oliver J. H. Stiefel, OSB No. 135436,
(503) 227-2212  oliver@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454

COMPLAINT FOR DECLARATORY &
INJUNCTIVE RELIEF—29